IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:26-cv-________

| | | |
|---|---|---|
| LATEGA POWELL,<br><br>Plaintiff,<br><br>v.<br><br>NORTH CAROLINA DEPARTMENT OF TRANSPORTATION; TUNYA M. SMITH, in her individual and official capacities; TONYA M. MARRIOTT, in her individual and official capacities; KIMBERLY S. PELLOM-FENNELL, in her individual and official capacities; and JOHN ELEY, in his individual and official capacities,<br><br>Defendants. | ) | **<u>COMPLAINT</u>**<br><br>**(JURY TRIAL DEMANDED)** |

Plaintiff Lattega Powell, by and through undersigned counsel, complains of Defendants and alleges as follows:

## <u>I. NATURE OF THE ACTION</u>

1. Latega Powell is a 62-year-old Black woman who has worked for the North Carolina Department of Transportation ("NCDOT") since March 2017. As a certification officer in NCDOT's then Office of Civil Rights[1] ("OCR"), her job was to police the integrity of the federal Disadvantaged Business Enterprise

[1] Since renamed Office of Economic Opportunity and Compliance.

("DBE") program — to make sure that the firms receiving federally subsidized set-aside contracts actually qualified for them and met the DBE qualifications.

2. She did that job. Between 2019 - 2023, Ms. Powell certified Austin Trucking Co. (Austin Trucking) as a DBE. In March 2023, Ms. Powell was notified by Juan Conde, a colleague, that Austin Trucking was being recommended to the North Carolina DOT Office of the Inspector General (OIG) for investigation into whether they actually qualified as a DBE. He requested Ms. Powell submit certain documentation from the file to OIG which she did. She received the annual renewal request with respect to Austin Trucking in April 2023.

3. Knowing that Austin Trucking was under review by the OIG, Ms. Powell carefully reviewed the file. Austin Trucking was owned by Jacob Austin, who was married to the daughter of Fred Smith, a former NC State senator and influential builder/developer. Austin Trucking had originally been certified in 2010 and repeatedly recertified as a socially and economically disadvantaged business without the documentation the federal regulations require.

4. Gena Brock, an employee who worked as a CPA in the Financial and Internal Audit section of the OIG had identified a concern with the tax records submitted by Austin Trucking that created an issue about whether Austin Trucking was properly certified as a DBE.

5. In addition, Ms. Powell learned that the firm's owner had reported a personal net worth that did not withstand scrutiny when evaluated according to the federal standards for being a DBE and that the documentation accepted by NC

DOT prior to Ms. Powell's tenure to support Austin Trucking's certification as a DBE was less than thorough.

6. Ms. Powell raised those concerns in writing to her supervisor, Benny Sloan, and also to the DBE certification consultant NCDOT had retained, and — outside her chain of command entirely — with the United States Department of Transportation. A USDOT CPA consultant later confirmed that the owner's net worth exceeded the program cap.

7. The matter escalated past Ms. Powell's level. Ms. Powell was later instructed by Mr. Sloan to write a letter certifying Austin Trucking, LLC, which she did. After the matter left her hands, Mr. Sloan eventually wrote a letter dated February 15, 2024, to Austin Trucking notifying the company that there were grounds to remove its DBE certification based on Jacob Austin's personal net worth calculated by considering multiple businesses owned by Mr. Austin.

8. Austin Trucking obtained emails written by Ms. Powell and counsel for Austin Trucking wrote a letter dated July 24, 2024, in which he attempted to paint Ms. Powell as biased against Jacob Austin based on his ethnicity. Austin Trucking requested that its suspension as a DBE be retracted and that if not, Austin Trucking requested an informal hearing pursuant to the NC Unified Certification Program (NCUCP) appeals process.

9. On August 9, 2024, Mr. Sloan notified Austin Trucking that it had been summarily suspended as a DBE and that an informal hearing would be scheduled within 30 days.

10. An informal hearing was conducted on October 1, 2024, and on October 31, 2024, Tunya Smith, the Office of Civil Rights Director, and supervisor of Mr. Sloan, wrote Austin Trucking upholding the decision to de-certify it as a DBE based on Austin Trucking's failure to cooperate by refusing to provide additional information about Jacob Austin's personal net worth.

11. On November 14, 2024, Austin Trucking filed a lawsuit in Wake County Superior Court and made Ms. Powell the face of its discrimination theory, even though Ms. Powell had no responsibility for the decision by either Mr. Sloan or Ms. Smith to decertify Austin Trucking for reasons related to Mr. Austin's personal net worth and his refusal to provide requested documentation of it.

12. On June 16, 2025, based on emails obtained by Austin Trucking, NCDOT and following a grievance filed by Ms. Powell as described below, NCDOT, acting through Tunya Smith and her assistant Tonya Marriott, along with others under her supervision, referred Ms. Powell to Employees Relations supervised by John Eley the Deputy Human Resources Director for investigation This administrative investigation focused on the events of 2023,

13. To find any issue, this investigation reached back more than two years into Ms. Powell's email history between March and July of 2023 when Ms. Powell was performing her job as a DBE certification officer and investigating whether to recertify Austin Trucking.

14. On April 7, 2025, Tunya Smith, Tonya Marriott, and Kimberly Pellom-Fennell, who had replaced Mr. Sloan, met with Ms. Powell and made numerous accusations against her.

15. On April 11, 2025, Ms. Powell reached out to Christine Smith, NCDOT Employee Relations representative, and voiced concerns about an atmosphere of bullying and harassment related to the Austin Trucking litigation based on the April 7, 2025, meeting.

16. On April 22, 2025, Tunya Smith emailed Ms. Powell and provided Ms. Smith's version of the events which occurred at the April 7, 2025, meeting.

17. On that same date, Ms. Powell faxed her own summary of the April 7, 2025, meeting to Christine Smith. In this email, Ms. Powell explicitly complained about age discrimination. She also complained about being retaliated against and called "biased" when she was simply doing her job as a DBE certification officer and pointing out to her supervisor previous failures by NC DOT employees to follow the federal DBE certification guidelines:

> I feel as though I am being targeted to build some case and eventually used against me to be forced out the door the way I've seen others treated in that environment. They have their favorites and will put one of their younger favorites in my position. It's very blatant what's been done.
>
> At the end of the meeting, Director Smith further gas lighted me by saying that she hoped I didn't leave the meeting feeling like I was "beat up" even though that's exactly what they did for 1.5 hours. She said the purpose of the meeting was for me to "reflect" on myself and make necessary changes.
>
> I am 61 years old and have never been treated in such a disrespectful, unprofessional manner during 35 years of work

> experience. I have worked steadily in a variety of environments, including overseas with people of different nationalities and languages, in corporate environment and have never been spoken to or treated in such manner, nor told that I am biased.
>
> It's really a shame because I have worked in OCR for 8 years and have been a Certification Officer since 2019.

18. Ms. Powell received an acknowledgment of her complaint of discrimination on the EEOC on that same date, April 22, 2025.

19. On May 12, 2025, an order was filed in the State Court litigation denying NC DOT's motion to dismiss the complaint based on Ms. Smith's decision to revoke Austin Trucking's DBE certification.

20. On May 15, 2025, Ms. Smith issued Ms. Powell a memorandum placing on her "Investigatory Leave" "to avoid disruption of the workplace and investigate allegations of performance or conduct."

21. The letter provided no facts related to the subject matter of the investigation but stated only:

an employee may be placed on investigatory leave with pay based on the following:

- To investigate allegations of performance or conduct deficiencies that may constitute just cause for disciplinary action;
- To avoid disruption of the workplace and/or to protect the safety of people or property;
- To provide time within which to schedule and conduct a pre-disciplinary conference; or,
- To facilitate a management directed referral or fitness for duty evaluation to ensure the employee's safety and the safety of others and to obtain medical information regarding the employee's fitness to perform his or her essential job functions.

22. On June 16, 2025, Ms. Powell was instructed to return to work and was issued a six-page written warning for "Unacceptable Personal Conduct" — accusing her, a DBE certification specialist, of violating Title VI and Title VII based on emails about which Smith had known since Austin Trucking quoted them in a letter in July of 2024.

23. The two male colleagues who worked the same file and wrote comparable emails, Benny Sloan (Black male) and Juan Conde (Hispanic male), were not disciplined at all.

24. The discipline followed hard on the heels of Ms. Powell's protected complaints and was temporally proximate:

- On April 7, 2025, the three managers (Smith, Pellom-Fennell, and Mark Whisenant) summoned Ms. Powell to a closed-door "personnel" meeting and accused her of bias, incompetence, and personal attacks.
- Kimberly Pellom-Fennel, her manager, had already asked her, in substance, how many more years she intended to work at NCDOT and mused about putting a newer and younger colleague in Powell's position.
- On April 20 and 22, 2025, Ms. Powell filed internal EEO and Employee Relations grievances complaining of age discrimination.
- On April 21, 2025, she began an EEOC inquiry.
- Twenty-three days after the grievance, NCDOT placed her on investigatory leave.
- Thirty days after that, NCDOT issued the Written Warning.

25. The retaliation has not stopped.

26. Between June and December 2025, after the written warning was issued, the workplace stress caused severe physical symptoms in Ms Powell including joint inflammation and pain, high blood pressure, fatigue, interrupted sleep, brain fog and vision issues. These symptoms were severe from December 2025 to April 2026 and flared again in June of 2026. These conditions were formally diagnosed in June 2026 as Lupus and fibromyalgia; symptom flares are caused by stress.

27. NC DOT provided incorrect information to Ms. Powell. As a result of Ms. Powell's reliance on this information, the majority of Ms. Powell's 192 hours of compensatory leave expired.

28. During this same time, NC DOT also refused to act on Ms. Powell's request for a thorough job classification review (desk audit). Indeed, this was one of the complaints that Smith voiced about Ms. Powell in the April 7, 2025, meeting: her requests for a classification review.

29. Most recently, in April of 2026, after Ms. Powell returned from FMLA, NCDOT stripped Ms. Powell of the certification duties she had performed for over six years and reassigned her to clerical work — telephoning firms and mailing several hundred certified letters. It revoked her telework eligibility.

30. When after her return in April 2026, the renewed retaliatory workplace harassment and demotion to clerical duties caused Ms. Powell to experience stress which triggered another lupus flare in June 2026. Ms. Powell was then

forced to once again invoke the Family and Medical Leave Act and requested telework as a disability accommodation, NCDOT reversed a telework authorization its own ADA officer had granted and refused to approve the hours she had actually worked. Eventually, after Ms. Powell reached out to HR, the denial was reversed.

31. Ms. Powell brings this action under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the Family and Medical Leave Act, 42 U.S.C. § 1983, and the North Carolina Whistleblower Act. She seeks back pay, front pay, compensatory and punitive damages, declaratory and injunctive relief, and attorneys' fees and costs.

## II. PARTIES

32. Plaintiff Latega Powell is a citizen and resident of Johnston County, North Carolina. She was born on September 23, 1963, and is 62 years old. She is Black and female. At all times relevant to this Complaint she was employed by NCDOT as a career State employee within the meaning of N.C. Gen. Stat. § 126-1.1, and she remains employed by NCDOT today.

33. Defendant North Carolina Department of Transportation is an agency of the State of North Carolina with its principal offices at 1 South Wilmington Street, Raleigh, North Carolina, and a mailing address of 1501 Mail Service Center, Raleigh, North Carolina 27699-1501. NCDOT employs more than 500 employees and is an "employer" within the meaning of 42 U.S.C. § 2000e(b), 29

U.S.C. § 630(b), 42 U.S.C. § 12111(5), and 29 U.S.C. § 2611(4). NCDOT is a recipient of federal financial assistance from the United States Department of Transportation.

34. Defendant Tunya M. Smith is, and at all relevant times was, the Director of NCDOT's Office of Civil Rights. She ordered the administrative investigation of Ms. Powell, signed the June 16, 2025 Written Warning, and is a named defendant in her official capacity in the Austin Trucking litigation described below. She is sued in her individual capacity for damages and in her official capacity for prospective declaratory and injunctive relief.

35. Defendant Tonya M. Marriott is, and at all relevant times was, the Deputy Director of NCDOT's Office of Civil Rights. She received Ms. Powell's February 2024 request for a classification review and never responded, participated in the certification meetings at which the Austin Trucking file was discussed, and witnessed the May 15, 2025 Notice of Administrative Investigation. She is sued in her individual capacity for damages and in her official capacity for prospective declaratory and injunctive relief. She is Smith’s “right hand.”

36. Defendant Kimberly S. Pellom-Fennell is, and at all relevant times after approximately April 2025 was, Ms. Powell's immediate supervisor and NCDOT's DBE Program Manager. She attended the April 7, 2025 meeting, made the age-related remarks alleged herein , reassigned Ms. Powell to clerical duties on April 17, 2026, and initially refused to approve time Ms. Powell worked on June 30 and July 1, 2026. She is sued in her individual capacity for

damages and in her official capacity for prospective declaratory and injunctive relief.

37. Defendant John Eley is the Deputy Human Resources Director and oversees all NCDOT employee relations. He disregarded/dismissed Ms. Powell's initial grievance in April 2025, allowed the ER investigator to improperly write and finalize an investigative report without interviewing her in violation of standard investigative procedures. He also delayed Ms. Powell's receipt of the EEO investigative report by sending it to an inactive email address, and refused to release the final report from Drake Maynard, the EEO investigator consultant, when Ms. Powell requested it, even though by statute, the report is part of Powell's personnel file. He is sued in his individual capacity for damages and in his official capacity for prospective declaratory and injunctive relief. He is a Black Male.

38. At all relevant times each individual Defendant acted under color of the laws of the State of North Carolina and within the scope of his or her employment, and each was an agent of NCDOT whose acts are attributable to NCDOT.

## III. JURISDICTION AND VENUE

39. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws and Constitution of the United States, and under 28 U.S.C. § 1343(a)(3) and (4) because it seeks redress for the deprivation, under color of state law, of rights secured by the Constitution and by Acts of Congress providing for equal rights.

40. This Court has supplemental jurisdiction over Plaintiff's North Carolina Whistleblower Act claim under 28 U.S.C. § 1367(a) because that claim arises from the same case or controversy as Plaintiff's federal claims.

41. This Court is authorized to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

42. Venue is proper in this District under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3). The unlawful employment practices alleged in this Complaint were committed in Wake County, North Carolina, where Ms. Powell works at 750 North at Greenfield Parkway, Garner, North Carolina, and the relevant employment records are maintained in Wake County, North Carolina as well. Wake County and Johnston County lie within the Western Division of the Eastern District of North Carolina.

## IV. ADMINISTRATIVE EXHAUSTION AND CONDITIONS PRECEDENT

43. On April 20, 2025, Ms. Powell filed an EEO Informal Grievance with NCDOT's EEO Office complaining of discrimination, harassment, and retaliation. On April 22, 2025, she submitted a written complaint and supporting statement to NCDOT Employee Relations representative Christine Smith.

44. On April 21, 2025, Ms. Powell initiated an inquiry with the United States Equal Employment Opportunity Commission, assigned reference number 433-2025-02421.

45. On July 31, 2025, Ms. Powell signed and submitted an Employment Discrimination Charge Intake Form to the North Carolina Office of

Administrative Hearings, Civil Rights Division, identifying race, sex/gender, and retaliation as bases and identifying June 16, 2025 as the most recent date of alleged harm. The charge was dual-filed with the EEOC and assigned Charge No. 14B-2025-00025.

46. The administrative investigation that followed encompassed age as well as race and sex. NCDOT's own EEO determination of September 25, 2025, addressed Ms. Powell's allegations "based on age," and NCDOT's Final Agency Decision of January 29, 2026, adjudicated her claims of "discrimination, harassment, and retaliation based on race, sex, and age." Ms. Powell's claims of race, sex, age discrimination and retaliation are reasonably related to, and grew out of, the investigation of the charge.

47. On June 15, 2026, the EEOC issued a Determination and Notice of Rights on Charge No. 14B-2025-00025, advising Ms. Powell of her right to sue. This Complaint is filed within 90 days of Ms. Powell's receipt of that notice.

48. Ms. Powell separately exhausted the North Carolina Employee Grievance Policy. She filed a Step 1 Grievance Filing Form on October 31, 2025; attended a Step 1 mediation on December 9, 2025, that ended in impasse; filed a Step 2 appeal on December 12, 2025; and received a Step 2 hearing on January 20, 2026. NCDOT issued a Final Agency Decision denying her grievance on January 29, 2026.

49. Ms. Powell filed a petition for a contested case with the North Carolina Office of Administrative Hearings, assigned Case No. 26OSP00717. After NCDOT

filed a motion to stay that matter based on Ms. Powell's pending EEOC charge, which was granted, that contested case was voluntarily dismissed and closed on or about July 20, 2026. No agency or tribunal has adjudicated the merits of the federal claims asserted here.

50. All conditions precedent to the filing of this action have been performed or have occurred.

## V. FACTUAL ALLEGATIONS

### A. Ms. Powell's Employment and Record at NCDOT

51. Ms. Powell began working for NCDOT on or about March 11, 2017, in what was then titled the Office of Civil Rights Division. She was hired as a Program Assistant V on March 11, 2017 and promoted to a DBE certification officer in March of 2023 with the classification of Program Coordinator IV.

52. Ms. Powell holds a bachelor's degree, earned in 1988, and brought approximately 35 years of professional experience to the position, including work overseas and in the private sector.

53. For most of her tenure Ms. Powell reported to Benny Sloan, the DBE Program Manager, a Black male. Mr. Sloan retired on or about April 1, 2025. Thereafter Ms. Powell reported to Defendant Pellom-Fennell.

54. Before June 16, 2025, NCDOT had never issued Ms. Powell a written warning or any other formal disciplinary action and she was eligible to telework under the NCDOT Remote Work Program Guidelines.

### B. Ms. Powell Reports That a Politically Connected Firm Was Certified Without the Documentation Federal Law Requires

55. A core duty of a DBE certification officer is to confirm, at initial certification and on annual renewal, that a firm's owner is in fact socially and economically disadvantaged within the meaning of 49 C.F.R. Part 26. Federal funds flow to DBE-certified firms; certification of an ineligible firm diverts public money from the businesses Congress intended the program to reach.

56. Austin Trucking, LLC received DBE certification from NCDOT's Office of Civil Rights on or about March 23, 2010. Its owner, Jacob Austin, claimed status as a Hispanic American. Mr. Austin is married to the daughter of a former North Carolina state legislator, gubernatorial candidate and prominent businessman

57. In March 2023, before Austin Trucking's annual renewal materials reached Ms. Powell, Contractor Compliance Officer, Juan Conde asked Ms. Powell to produce the firm's initial application, affidavit, and tax returns. Ms. Powell was told the firm had been referred to the NCDOT Office of Inspector General for investigation, and that one of their concerns was the firm's eligibility for the DBE program. Ms. Powell provided the documents by email on March 14, 2023.

58. On April 14, 2023, Austin Trucking's annual renewal materials arrived in Ms. Powell's queue. She emailed Mr. Sloan the same day and reported that the file contained no official documentation verifying the owner's social disadvantage and no birth certificate. Mr. Sloan responded that the firm was "currently under review by OIG."

59. On April 20, 2023, Ms. Powell asked Mr. Sloan what he wanted done with the annual renewal. He replied: "Just hold it for now. OIG is investigating this firm."

60. On June 8, 2023, Mr. Sloan wrote, "You can proceed with his renewal." Ms. Powell asked what the outcome of the OIG investigation had been and what had become of the questions about the owner's ethnicity claims. Mr. Sloan replied that OIG was handling it and invited her to speak with the investigator.

61. On July 11, 2023, Mr. Conde sent Ms. Powell a link to voter registration records indicating that the owner had registered under a group membership different from the one on which his DBE certification rested.

62. On July 12, 2023, Ms. Powell conducted a routine site visit. On July 13, 2023, applying 49 C.F.R. § 26.63(a)(1) as it then read, she asked the owner in writing to produce documentation of his group membership. The owner produced his own and his father's birth certificates and, later, North Carolina DMV records from 2021 and 2022 — all post-dating his 2009 certification.

63. At a DBE certification team meeting in early August 2023, Defendant Marriott told the certification team, in Mr. Sloan's presence, that upon consultation with counsel, DMV records were not acceptable proof of group membership "because they are considered self-identification."

64. On August 21, 2023, Ms. Powell contacted an Equal Opportunity Specialist at the United States Department of Transportation and laid out the Austin

Trucking file for that federal official. She reported that the owner's claimed heritage was unsupported by pre-certification documentation and that his submitted personal net worth statement had been understated by more than $500,000 until she pressed for supporting documentation. This communication was made outside Ms. Powell's chain of command, to an official of a different sovereign, and was not a task assigned to her or listed among her duties.

65. On September 6, 2023, at Ms. Powell's suggestion and with Mr. Sloan's agreement, Ms. Powell and Mr. Sloan met via virtual meeting with the outside DBE certification consultant NCDOT had retained. The consultant agreed that the file presented red flags as to both group membership and personal net worth. At Mr. Sloan's direction, Ms. Powell drafted a Proposal to Remove and circulated it to Mr. Sloan and the consultant for review.

66. On November 14, 2023, at Mr. Sloan's request. Jacob Austin produced college records from 1987 showing that the owner had identified as Hispanic before certification. Sloan then directed Ms. Powell to finalize the annual approval. She processed the approval November 16, 2023, without objection.

67. On January 9, 2024, Mr. Sloan asked Ms. Powell to prepare a second Proposal to Remove for Austin Trucking because an OIG auditor, Gena Brock had found discrepancies in the owner's tax returns. The OIG auditor ultimately determined that the owner's personal net worth exceeded the cap for DBE program eligibility. Ms. Powell's concerns were validated.

### C. The Contractor Sues NCDOT and NCDOT Turns on Ms. Powell

68. On or about November 14, 2024, Jacob Austin and Austin Trucking, LLC filed suit against NCDOT and Defendant Smith, in her official capacity, in Wake County Superior Court, captioned Austin v. North Carolina Department of Transportation, No. 24CVS036644-910. An Amended Complaint followed on or about December 16, 2024. The contractor alleged that NCDOT had discriminated against him in the certification process.

69. Austin Trucking's theory rested on Ms. Powell's emails. In December 2024, the contractor served public records subpoenas on NCDOT through the North Carolina Department of Justice, obtained a temporary restraining order, and moved for a preliminary injunction, which was heard in January 2025.

70. OCR management, including Ms. Powell, was briefed on the case in August 2024. At that time NCDOT disciplined no one.

71. On July 2, 2025, Austin Trucking noticed Ms. Powell's deposition in the Wake County action. Her deposition was re-noticed and amended thereafter, including in April 2026.

72. NCDOT's exposure in the Austin Trucking litigation gave Defendants a powerful institutional motive to recharacterize Ms. Powell's regulatory diligence as personal bias, and to create a contemporaneous personnel record saying so. That is precisely what they did.

### C. Age-Based Remarks and the April 7, 2025 "Personnel" Meeting

73. In February 2024, Ms. Powell emailed Defendant Marriott to request a review of her job classification. She received no response.

74. In early 2025, Ms. Powell raised the unanswered classification request with Defendant Pellom-Fennell. Pellom-Fennell responded, in substance: "so you are disgruntled. I wonder if we can get [a newer and younger colleague] into your position?" In the same conversation Pellom-Fennell asked Ms. Powell how many more years she intended to work at NCDOT.

75. On March 25 and 26, 2025, Ms. Powell attended a two-day DBE certification training conducted by a USDOT representative, the same CPA consultant who had reviewed the Austin Trucking financials. During a class discussion Ms. Powell observed that, in her experience, firms with 51%/49% ownership splits warranted closer review of ownership and control — an observation grounded in 49 C.F.R. § 26.71(d).

76. On April 2, 2025, at a weekly staff meeting, Ms. Powell asked Defendant Smith how certain contemplated process changes would be implemented.

77. At 10:30 a.m. on April 7, 2025, Defendant Smith summoned Ms. Powell to a "personnel" meeting that same day. From approximately 1:15 p.m. to 3:00 p.m., Defendants Smith, Pellom-Fennell, and Whisenant accused Ms. Powell of bias in decision-making, lack of proficiency in basic accounting, and making "personal attacks" on Defendant Smith by asking work-related questions.

78. When Ms. Powell attempted to explain the federal regulations underlying her practices, she was told that the managers were not interested in the regulations and that the perception of bias was what mattered. Defendant Smith accused Ms. Powell of bias in connection with a second firm; Ms. Powell

later confirmed that she had never reviewed that firm, which had been denied in 2014, before she was employed by NCDOT.

79. Defendant Smith told Ms. Powell that she was being watched when she used a conference room, remarking that "you never know when someone is listening at the door."

80. When Ms. Powell renewed her request for a classification review, Mark Whisenant told her that she could request a desk audit but that "it might work out in your favor and it might not — your position could possibly be downgraded."

81. Defendant Smith characterized the April 7, 2025 meeting in writing as "counseling, pre-disciplinary."

82. The meeting left Ms. Powell unable to sleep for two nights and in a state of acute anxiety. At 61 years old, with 35 years of work experience, she had never been treated this way by an employer.

**D. Ms. Powell's Protected Complaints**

83. On April 20, 2025, Ms. Powell filed an EEO Informal Grievance Filing Form with NCDOT's EEO Office. She identified herself as a Black female career State employee and reported that she had been "unfairly accused of being biased," that she felt "intimidated, bullied, and harassed," that she was "being targeted for nefarious motivations," and that she had "watched colleagues fired and voluntarily leave after receiving the same treatment." She attached a detailed account of the April 7, 2025 meeting that included Pellom-Fennell's

"newer and younger" remark and Ms. Powell's statement that she was 61 years old.

84. On April 21, 2025, Ms. Powell initiated an EEOC inquiry, reference number 433-2025-02421.

85. On April 22, 2025, Ms. Powell spoke with NCDOT Employee Relations representative Christine Smith, was advised to submit a written complaint, and did so, transmitting a signed statement with supporting emails by fax the same day.

86. Also on April 22, 2025, Defendant Smith emailed Ms. Powell a written "recap" of the April 7, 2025 meeting, copying Defendants Whisenant, Pellom-Fennell, and Marriott. The recap asserted that Ms. Powell's comments "questioning of the legitimacy of a submitted DBE application" had "caused concerns at the executive leadership level," faulted her for "consistently 'question[ing]' leadership," and warned her that emails become "[p]ublic records and not to use a firm's files" as a "means to inquire or question leadership."

87. On April 23, 24, and 26, 2025, Ms. Powell responded in writing, disputing the recap point by point.

88. Defendants Smith, Marriott, and Pellom-Fennell, each knew of Ms. Powell's internal complaints.

### E. Investigatory Leave and the June 16, 2025 Written Warning

89. On May 15, 2025 — twenty-five days after Ms. Powell filed her EEO grievance and twenty-three days after her Employee Relations complaint — Defendant

Smith ordered an administrative investigation of Ms. Powell. Ms. Powell was served with a Notice of Administrative Investigation, witnessed by Defendants Smith and Marriott, which warned her that she could be dismissed for discussing the investigation with anyone. She was placed on investigatory leave with pay and removed from the workplace in a very degrading and humiliating manner, including being walked out by a police officer in front of colleagues. After this public humiliation, Ms. Powell was sick for three weeks.

90. On June 9, 2025, Defendant Smith received the results of the investigation.

91. On June 16, 2025, Defendant Smith hand-delivered a Written Warning for Unacceptable Personal Conduct. It charged Ms. Powell with (1) willful violation of work rules, "specifically, violation of Title VI and Title VII of the Civil Rights Acts, as a result of your bias and harassment based on race"; (2) insubordination; (3) making a derogatory comment of a sexual nature about her former manager to a co-worker; (4) conduct for which no reasonable person should expect prior warning; and (5) conduct unbecoming a State employee.

92. The Written Warning rested entirely on conduct from 2023 — more than two years earlier — that Ms. Powell had performed under Mr. Sloan's supervision and with his knowledge. Ms. Powell received no discipline of any kind at that time, from Mr. Sloan, her supervisor at that time. The Warning expressly tied the discipline to the litigation, stating that Ms. Powell's "series of email exchanges questioning the legitimacy of Mr. Austin's race led to a public records request and subpoena, with a lawsuit against NCDOT," and that her

"derogatory statements and lack of proficiency in certification handling of the Austin case file led to a lawsuit against NCDOT."

93. The Written Warning treated Ms. Powell's application of 49 C.F.R. § 26.63 — the very regulation that obligates a certifier with a well-founded reason to question group membership to require additional evidence — as an "unsanctioned and relentless pursuit" and as harassment. It faulted her for contacting USDOT, describing that contact as an "unsanctioned and escalated pursuit."

94. The Written Warning imposed concrete losses. It revoked Ms. Powell's eligibility to telework, stating that as of June 16, 2025, she was "not eligible to telework outside of your NCDOT workstation." It required her to forfeit and repay a prorated portion of any sign-on or retention bonus she may have received. And it stated that further conduct issues "may result in further disciplinary action up to and including dismissal."

95. Ms. Powell refused to sign the Written Warning on June 16, 2025.

96. On June 23, 2025, Ms. Powell submitted a detailed written Rebuttal to Defendant Smith, copying Defendants Marriott and Pellom-Fennell and NCDOT Human Resources. The Rebuttal documented, email by email, that Mr. Sloan had directed her to hold the file pending the OIG investigation, that she had approved the firm without hesitation after receiving pre-certification documentation, and that she had never refused a directive. The Rebuttal also

asserted that the discipline was a retaliatory personnel action for reporting improper government activity.

97. Around this time Ms. Powell also lost accrued compensatory time. She had been prevented from using compensatory hours before they expired, and hours she had earned were forfeited due to incorrect information from her supervisor.

### F. NCDOT Disciplines No One Else

98. Benny Sloan, a Black male, was the DBE Program Manager who supervised the Austin Trucking file throughout the 2023 events. He directed Ms. Powell to hold the renewal, corresponded directly with the owner, participated in the consultant meeting, reviewed the draft Proposal to Remove, and ultimately directed the approval. He received no discipline.

99. Juan Conde, a Hispanic male, was the Contractor Compliance Officer who referred the firm to OIG, requested the underlying documents, and sent Ms. Powell the voter registration records that first raised the group-membership question. Mr. Conde made comments in emails comparable to Ms. Powell's. He received no discipline.

100. Ms. Powell — the only Black woman and the only employee over 60 among the three — was the only person disciplined.

101. Ms. Powell has observed a pattern at OCR in which older Black female employees are subjected to escalating criticism and scrutiny until they resign or are terminated. She reported that pattern in her charge of discrimination.

### G. NCDOT's Internal Process Ratifies the Retaliation

102. NCDOT retained an outside human resources professional to conduct an EEO informal inquiry into Ms. Powell's April 20, 2025, complaint. Ms. Powell was interviewed on August 12, 2025.

103. On September 25, 2025, Assistant HR Director John W. Eley issued a "No Cause" determination. Ms. Powell did not receive it; it was sent to an outdated personal email address and was not delivered to her by certified mail until October 21, 2025.

104. Ms. Powell filed a Step 1 Grievance Filing Form on October 31, 2025. Mediation on December 9, 2025, ended in impasse. She filed a Step 2 appeal on December 12, 2025, and the hearing was held January 20, 2026.

105. On January 29, 2026, NCDOT Chief Operating Officer Christopher A. Peoples issued a Final Agency Decision denying the grievance. The decision adopted findings that included the assertion that Ms. Powell had engaged in a "hyper vigilant campaign of investigation" of Austin Trucking; that her comments in training "raised concerns about her improper analysis of DBE applicants"; that she had "made an arguably sexual comment"; that she has a history of unacceptable personal conduct and insubordination; and that she had asked for educational leave within two months of a prior job in Charlotte. The decision reasoned that there was "no evidence" of discrimination in part because Ms. Powell's supervisor "is a Black female over 40 years of age." It is ironic that the defendant is claiming Ms. Powell has a history of non-compliance, including with her former manager, Benny Sloan. In 2018, in a

minor disagreement that was resolved Mr. Sloan deemed it necessary to write up the incident; but it was never submitted to HR. Yet, this is what the defendant claims to be repeated incidences, within the same period time, of insubordination to Mr. Sloan and management, Ms. Powell was never written up in 2023 during the review of Austin Trucking, and in fact received a positive performance review from Benny Sloan in that performance cycle.

106. The Final Agency Decision confirmed that Ms. Powell's grievance had squarely presented claims of "discrimination, harassment, and retaliation based on race, sex, and age" and a claim that the Written Warning "was a retaliatory personnel action for reporting improper government activities in violation of the Whistleblower Protection Act (G.S. § 126-84 et seq.)."

**H. Continued Retaliation in 2026: Removal of Duties**

107. On April 17, 2026 — during the same period in which Ms. Powell's deposition in the Austin Trucking litigation was being re-noticed — Defendant Pellom-Fennell emailed Ms. Powell a "Daily Task" list copying Defendants Marriott and Smith.

108. The tasks assigned were clerical: making follow-up telephone calls to firms, mailing certified letters after a third contact attempt, reporting weekly on calls and mailings, coordinating outreach, tracking response rates, and updating a spreadsheet. A junior colleague was directed to "provide guidance to Latega along with the spreadsheet she is to use."

109. The assignment stripped Ms. Powell of the DBE certification and eligibility determination work she had performed since 2019 — the substantive core of her position — and replaced it with administrative tasks. In practice it required her to process, mail, update, and monitor approximately 560 certified letters by hand.

110. Ms. Powell's classification and salary were not adjusted, but the responsibilities, professional standing, and advancement prospects attached to her position were materially diminished. Her request for a classification review, first made in February 2024, remained unanswered.

**I. Disability, FMLA Leave, and NCDOT's Interference**

111. The sustained treatment described above caused Ms. Powell severe stress. On or about January 26, 2026, NCDOT issued Ms. Powell a provisional FMLA designation letter. On February 23, 2026, Ms. Powell submitted a completed WH-380-E Certification of Health Care Provider, and NCDOT HR Consultant Lisa Coggin corresponded with her regarding a continuous FMLA request.

112. Ms. Powell has been diagnosed with Systemic Lupus Erythematosus and fibromyalgia — chronic systemic autoimmune and pain disorders that substantially limit major life activities including walking, standing, lifting, sleeping, concentrating, and the operation of her immune, musculoskeletal, and neurological systems. She is an individual with a disability within the meaning of 42 U.S.C. § 12102, and her conditions constitute a serious health condition within the meaning of 29 U.S.C. § 2611(11).

113. Ms. Powell has been employed by NCDOT for more than twelve months and worked at least 1,250 hours in each twelve-month period preceding her requests for leave. She is an eligible employee within the meaning of 29 U.S.C. § 2611(2).

114. On April 26, 2026, Ms. Powell requested an adjustable workstation. An assessment was conducted on June 4, 2026. She received no accommodation and no estimated date of delivery.

115. Ms. Powell had also requested, upon returning from investigative leave in June 2025, to be moved from a cubicle adjacent to a high-traffic conference room. That request was ignored.

116. The April 17, 2026, reassignment to manual processing of approximately 560 certified letters caused musculoskeletal strain and triggered an acute lupus flare.

117. On June 22, 2026, Ms. Powell gave NCDOT formal written notice that she was commencing intermittent FMLA leave effective that day and simultaneously requested, as a reasonable accommodation under the ADA, authorization to telework at least three days per week. She attached her medical provider's certification, which stated that high-stress environments are a medical contraindication for her condition. She addressed the notice to HR Policy and Benefits Manager Daphne Wright and the HR Consultant and copied Whisenant.

118. On June 24, 2026, Defendant Pellom-Fennell demanded that Ms. Powell explain who had authorized her to telework.

119. On June 29, 2026, NCDOT ADA Accommodations Officer Eileen Bagnall met with Ms. Powell and confirmed in writing that she would present four requests to management: telework until symptoms were controlled; a hybrid schedule of two days in office and three days teleworking; relocation to a quieter work area; and a sit/stand desk. Ms. Powell asked Ms. Bagnall to inform management that she was authorized to telework on an interim basis during the interactive process.

120. On June 30, 2026, at 3:43 p.m., Ms. Bagnall confirmed in writing: "As per your doctor's note, you may telework through July 2, 2026." Ms. Powell worked in reliance on that authorization.

121. On July 1, 2026, at 8:59 a.m., Ms. Bagnall reversed course: "Rereading your doctor's note it says you are not to work this week. Please follow your doctor's orders." Ms. Powell stopped working immediately.

122. On July 7, 2026, Defendant Pellom-Fennell told Ms. Powell by Microsoft Teams message that she would not approve the hours Ms. Powell had worked on June 30 and July 1, 2026: "You should not have been working with the note and I also advised you about that as well. Please correct your time and I will approve." Ms. Powell responded that Ms. Bagnall "put in writing that I could telework on both days" and that she had "stopped when told to discontinue

working." Pellom-Fennell replied, "I cannot approve time worked when I have a doctor's note advising otherwise."

123. NCDOT thus placed Ms. Powell in an impossible position: it authorized her to work, withdrew the authorization the next morning, and then refused to pay her for the hours she had already worked in reliance on the authorization. The interactive process on her accommodation requests has produced no accommodation.

**J. Injury**

124. As a direct and proximate result of Defendants' conduct, Ms. Powell has suffered and continues to suffer lost compensation, including forfeited compensatory hours and unpaid hours worked; the loss of telework eligibility and the value of that benefit; the loss of the substantive duties, professional standing, and advancement opportunity attached to her position; the denial of a classification review to which she was entitled; and diminished future earning capacity.

125. As a result of her hostile work environment, Ms. Powell has also suffered severe emotional distress, humiliation, anxiety, sleeplessness, loss of enjoyment of life, and physical harm, including the development and exacerbation of lupus and fibromyalgia including an acute flare requiring emergency care in July and September 2026.

126. Defendants acted intentionally, and with malice or reckless indifference to Ms. Powell's federally protected rights.

## VI. CLAIMS FOR RELIEF

**COUNT I**
**Retaliation in Violation of Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e-3(a)**
**(Against Defendant NCDOT)**

127. Plaintiff realleges and incorporates by reference every preceding paragraph of this Complaint as if fully set forth herein.

128. Title VII makes it unlawful for an employer to discriminate against an employee because she "has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

129. Ms. Powell engaged in protected activity when she filed her EEO Informal Grievance on April 20, 2025; when she initiated an EEOC inquiry on April 21, 2025; when she complained to Employee Relations in writing on April 22, 2025; when she responded in writing on April 23, 24, and 26, 2025; when she submitted her Rebuttal on June 23, 2025; when she filed her charge of discrimination on July 31, 2025; and when she pursued her Step 1 and Step 2 grievances through January 2026.

130. Ms. Powell reasonably and in good faith believed that the conduct she opposed — being singled out for discipline, hostile treatment, denied a classification review afforded to others, and told that a "newer and younger" employee might take her place — violated Title VII.

131. Defendant NCDOT, acting through Defendants Smith, Marriott, Pellom-Fennell, and others knew of each of these protected activities.

132. NCDOT then subjected Ms. Powell to materially adverse actions that would dissuade a reasonable worker from making or supporting a charge of discrimination, including: ordering an administrative investigation; placing her on investigatory leave and removing her from the workplace for approximately one month; issuing a Written Warning for Unacceptable Personal Conduct; revoking her telework eligibility; requiring repayment of any prorated retention bonus; permitting her earned compensatory time to expire; refusing to act on her classification review request; stripping her of her certification duties and reassigning her to clerical work; and refusing to approve and pay for hours she actually worked. See Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 68 (2006).

133. The temporal proximity between Ms. Powell's protected activity and NCDOT's adverse actions is striking. NCDOT ordered the investigation twenty-five days after her EEO grievance. It issued the Written Warning thirty-two days after that — for conduct that had occurred more than two years earlier, had been performed under her supervisor's direction, and had never before drawn so much as a counseling.

134. NCDOT's stated reasons for the discipline are pretextual. The agency disciplined Ms. Powell for applying 49 C.F.R. § 26.63 as written; treated her contact with the federal regulator as misconduct; adopted the litigation

adversary's characterization of her emails; and disciplined no one else who worked the same file or expressed the same concerns.

135. As a direct and proximate result, Ms. Powell has suffered the injuries alleged above. She is entitled to back pay, front pay or reinstatement to her prior duties, compensatory damages, injunctive and declaratory relief, and attorneys' fees and costs under 42 U.S.C. §§ 2000e-5(g) and (k).

**COUNT II**
**Discrimination on the Basis of Sex and Race in Violation of Title VII**
**42 U.S.C. § 2000e-2(a)(1)**
**(Against Defendant NCDOT)**

136. Plaintiff realleges and incorporates by reference every preceding paragraph of this Complaint as if fully set forth herein.

137. Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race [or] color." 42 U.S.C. § 2000e-2(a)(1).

138. Ms. Powell is Black. She is a member of a protected class on the basis of both sex and race.

139. Ms. Powell was performing her job satisfactorily. She had never received formal discipline in eight years at NCDOT, had received a retention bonus, and was eligible to telework.

140. NCDOT subjected Ms. Powell to adverse action affecting the terms, conditions, and privileges of her employment, including investigatory leave, a Written Warning, the loss of telework, , the loss of compensatory time, the denial of a

classification review, and the removal of her substantive job duties. Each inflicted harm with respect to an identifiable term or condition of her employment. See Muldrow v. City of St. Louis, 601 U.S. 346, 354-55 (2024).

141. Similarly situated employees outside Ms. Powell's protected class were treated more favorably. Juan Conde, a Hispanic male, referred Austin Trucking to OIG, requested the underlying documentation, supplied the voter registration records that generated the group-membership inquiry, and made comments in emails comparable to Ms. Powell's. He was not investigated, was not placed on leave, and was not disciplined.

142. NCDOT also permitted its own certification staff to certify Austin Trucking in 2010and to renew that certification for years without the documentation federal law requires and disciplined no one for those failures. It disciplined only Ms. Powell, and only for insisting that the documentation be produced.

143. Upon information and belief, NCDOT's Office of Civil Rights has subjected older Black female employees to heightened scrutiny, escalating criticism, and hostile treatment until they resigned or were terminated. Ms. Powell witnessed that pattern and reported it.

144. Race and sex were motivating factors in NCDOT's treatment of Ms. Powell. 42 U.S.C. § 2000e-2(m).

145. As a direct and proximate result, Ms. Powell has suffered the injuries alleged above and is entitled to the full measure of relief available under Title VII.

**COUNT III**

**Discrimination on the Basis of Sex in Violation of Title VII**
**42 U.S.C. § 2000e-2(a)(1)**
**(Against Defendant NCDOT)**

146. Plaintiff realleges and incorporates by reference every preceding paragraph of this Complaint as if fully set forth herein.

147. Ms. Powell is female and a member of a protected class on the basis of sex.

148. NCDOT subjected Ms. Powell to the adverse actions alleged above.

149. Two male comparators worked the same Austin Trucking file and engaged in materially similar conduct. Benny Sloan, a Black male, was the DBE Program Manager who directed the handling of the file at every stage: he ordered the renewal held pending the OIG investigation, corresponded directly with the OIG auditors and the owner, convened the consultant, reviewed the draft Proposal to Remove, and directed final approval. Juan Conde, a Hispanic male, initiated the inquiry and supplied the evidence on which it proceeded. Neither man was investigated, placed on leave, or disciplined, either at the time they engaged in those actions or more than two years later.

150. NCDOT further charged Ms. Powell with "[u]nsolicited [s]peech of a [s]exual [n]ature" for a single Spanish-language remark in an email to a co-worker about a male supervisor, and treated that remark as unacceptable personal conduct warranting formal discipline. Upon information and belief, NCDOT has not disciplined male employees for comparable remarks.

151. Sex was a motivating factor in NCDOT's treatment of Ms. Powell. 42 U.S.C. § 2000e-2(m).

152. As a direct and proximate result, Ms. Powell has suffered the injuries alleged above and is entitled to the full measure of relief available under Title VII.

**COUNT IV**
**Age Discrimination and Retaliation in Violation of the ADEA**
**29 U.S.C. §§ 623(a), 623(d)**
**(Against Defendant NCDOT and the Individual Defendants in Their Official Capacities)**

153. Plaintiff realleges and incorporates by reference every preceding paragraph of this Complaint as if fully set forth herein.

154. Ms. Powell was 61 years old at the time of the events alleged and is 62 today. She is within the class protected by the ADEA. 29 U.S.C. § 631(a).

155. Defendant Pellom-Fennell, Ms. Powell's supervisor, responded to Ms. Powell's request for a classification review by calling her "disgruntled," wondering aloud whether a different, younger colleague with far less seniority (newer and younger) could be placed in her position, and asking how many more years she intended to work at NCDOT. These remarks were made by a decision maker, in the context of a decision about the terms of Ms. Powell's employment, and shortly before the discipline at issue.

156. NCDOT thereafter denied Ms. Powell the classification review she had requested, warned her that seeking a job audit could result in her position being "downgraded," investigated her, placed her on leave, disciplined her, revoked her telework, allowed her compensatory time to lapse, and ultimately removed her professional duties and assigned her clerical work.

157. But for Ms. Powell's age, NCDOT would not have taken these actions. See Gross v. FBL Financial Services, Inc., 557 U.S. 167, 176 (2009).

158. The ADEA independently forbids retaliation against an employee who opposes practices made unlawful by the Act or who makes a charge under it. 29 U.S.C. § 623(d). Ms. Powell opposed age discrimination in her April 20, 2025 EEO grievance, which recited Pellom-Fennell's "newer and younger" remark and Ms. Powell's age; NCDOT's own EEO determination confirms that her complaint was investigated as an age complaint. NCDOT retaliated against her for that opposition through the adverse actions alleged above.

159. Ms. Powell seeks all relief available under 29 U.S.C. § 626(b), including back pay, liquidated damages for NCDOT's willful violations, and attorneys' fees and costs.

160. To the extent any portion of this Count is subject to a claim of sovereign immunity, Ms. Powell seeks prospective declaratory and injunctive relief against the individual Defendants in their official capacities. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908).

**COUNT V**
**First Amendment Retaliation**
**42 U.S.C. § 1983**
**(Against Defendants Smith, Marriott, Pellom-Fennell, and Whisenant, in Their Individual and Official Capacities)**

161. Plaintiff realleges and incorporates by reference every preceding paragraph of this Complaint as if fully set forth herein.

162. The First Amendment, applied to the States through the Fourteenth Amendment, protects a public employee who speaks as a citizen on a matter of public concern. Pickering v. Board of Education, 391 U.S. 563, 568 (1968); Connick v. Myers, 461 U.S. 138, 147 (1983).

163. The controlling question is not whether speech concerns an employee's work, but whether the speech "is itself ordinarily within the scope of an employee's duties." Lane v. Franks, 573 U.S. 228, 240 (2014); see Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). Speech about "[c]orruption in a public program and misuse of state funds" lies at the heart of the First Amendment's concern. Lane, 573 U.S. at 241.

164. Ms. Powell engaged in speech as a citizen on matters of public concern, outside the ordinary scope of her duties, including:

(a) her August 21, 2023 communication to an Equal Opportunity Specialist at the United States Department of Transportation, reporting that a DBE-certified firm had been certified without pre-certification documentation of group membership and after submitting an understated personal net worth statement. Contacting a federal regulator outside her chain of command was not a task assigned to Ms. Powell, was not listed among her duties, and required — as her supervisor acknowledged in writing — a step beyond NCDOT's ordinary practice;

(b) her internal grievances of April 20 and April 22, 2025, and her June 23, 2025 Rebuttal, in which she reported that NCDOT had certified and then repeatedly recertified a politically connected contractor without the documentation federal regulations require; she was being disciplined for having investigated and reported this after it was called to her attention Filing a grievance was not among Ms. Powell's job duties as a certification officer;

(c) her charge of discrimination filed July 31, 2025, and the grievance appeals she pursued through January 2026, reporting that a state agency's civil rights office was itself discriminating and retaliating; and

(d) her participation as a witness in *Austin v. North Carolina Department of Transportation*, No. 24CVS036644-910 (Wake Cnty. Super. Ct.), in which her deposition was noticed on July 2, 2025, and re-noticed thereafter. Testimony compelled by subpoena in a judicial proceeding is citizen speech. *Lane*, 573 U.S. at 238.

165. Each subject of that speech — the integrity of a federally funded set-aside program, the expenditure of federal transportation dollars, whether a politically connected firm received favorable treatment, and whether a state civil rights office discriminates against its own employees — is a matter of public concern.

166. Ms. Powell's interest in speaking on these matters, and the public's interest in receiving her speech, substantially outweigh any interest NCDOT had in the

efficient provision of public services. NCDOT identified no disruption caused by her speech other than the litigation the contractor chose to file.

167. The individual Defendants retaliated against Ms. Powell because of that speech. The Written Warning states the causal connection on its face: it charges that Ms. Powell's "series of email exchanges questioning the legitimacy of Mr. Austin's race led to a public records request and subpoena, with a lawsuit against NCDOT"; it characterizes her contact with USDOT as an "unsanctioned and escalated pursuit"; and Defendant Smith's April 22, 2025 recap faulted Ms. Powell for "consistently 'question[ing]' leadership" and warned her that "[p]ublic records and a firm's files are not appropriate means to inquire or question leadership."

168. The retaliatory actions — investigatory leave, formal discipline, loss of telework, removal of duties, and the threat of dismissal — would deter a person of ordinary firmness from engaging in protected speech.

169. The individual Defendants acted under color of state law and are not entitled to qualified immunity. The right of a public employee to report suspected fraud in a federally funded program to a federal regulator, and to file discrimination grievances, without suffering retaliation was clearly established at all relevant times.

170. As a direct and proximate result, Ms. Powell has suffered the injuries alleged above. She is entitled to compensatory and punitive damages against the individual Defendants in their individual capacities, to prospective declaratory

and injunctive relief against them in their official capacities, and to attorneys' fees under 42 U.S.C. § 1988.

**COUNT VI**
**Denial of Equal Protection — Race and Sex**
**42 U.S.C. § 1983**
**(Against Defendants Smith, Marriott, Pellom-Fennell, and Whisenant, in Their Individual and Official Capacities)**

171. Plaintiff realleges and incorporates by reference every preceding paragraph of this Complaint as if fully set forth herein.

172. The Equal Protection Clause of the Fourteenth Amendment guarantees Ms. Powell the right to be free from intentional discrimination on the basis of race and sex by state actors in the terms and conditions of her public employment.

173. The individual Defendants, acting under color of state law, intentionally treated Ms. Powell less favorably than similarly situated employees outside her protected classes, including Benny Sloan and Juan Conde, on the basis of her race and sex.

174. There is no rational, let alone compelling or exceedingly persuasive, justification for the disparate treatment described in this Complaint.

175. The rights at issue were clearly established, and no reasonable official in Defendants' position could have believed that singling out the only Black woman among three similarly situated employees for investigation and discipline was lawful.

176. As a direct and proximate result, Ms. Powell has suffered the injuries alleged above and is entitled to compensatory and punitive damages, prospective declaratory and injunctive relief, and attorneys' fees under 42 U.S.C. § 1988.

## COUNT VII
## Interference with and Retaliation for the Exercise of FMLA Rights
## 29 U.S.C. §§ 2615(a)(1), (a)(2)
## (Against the Individual Defendants in Their Individual and Official Capacities, and Against NCDOT)

177. Plaintiff realleges and incorporates by reference every preceding paragraph of this Complaint as if fully set forth herein.

178. Ms. Powell is an eligible employee, NCDOT is a covered employer, and Ms. Powell's lupus and fibromyalgia constitute a serious health condition under the FMLA.

179. Ms. Powell exercised rights protected by the FMLA when she submitted FMLA certification in February 2026 and when she gave formal written notice on June 22, 2026, that she was commencing intermittent FMLA leave.

180. Defendants interfered with, restrained, and denied the exercise of those rights in violation of 29 U.S.C. § 2615(a)(1) by, among other things, demanding on June 24, 2026, that Ms. Powell justify who had authorized her leave arrangement; reversing on July 1, 2026, a telework authorization NCDOT had granted in writing the previous afternoon; and refusing on July 7, 2026, to approve or pay for hours Ms. Powell had actually worked in reliance on that written authorization.

181. Defendants retaliated against Ms. Powell for exercising FMLA rights in violation of 29 U.S.C. § 2615(a)(2). Ms. Powell engaged in protected activity, Defendants took adverse action against her, and the adverse action was causally connected to the protected activity. *See Yashenko v. Harrah's NC Casino Co.,* 446 F.3d 541, 550-51 (4th Cir. 2006).

182. The adverse actions followed within days and weeks of Ms. Powell's FMLA notice. Defendant Pellom-Fennell — the same supervisor who had asked how many more years Ms. Powell intended to work — challenged her leave two days after the notice and docked her pay fifteen days after it.

183. Defendants' violations were not in good faith and Defendants had no reasonable grounds to believe their conduct complied with the FMLA.

184. Ms. Powell seeks all relief available under 29 U.S.C. § 2617, including lost compensation, liquidated damages, interest, equitable relief, and attorneys' fees and costs. To the extent any portion of this Count is subject to a claim of sovereign immunity, Ms. Powell seeks prospective declaratory and injunctive relief against the individual Defendants in their official capacities under Ex parte Young, 209 U.S. 123 (1908), and damages against them in their individual capacities as "employers" within the meaning of 29 U.S.C. § 2611(4)(A)(ii)(I).

## COUNT VIII
## Failure to Accommodate, Discrimination, and Interference in Violation of the ADA
## 42 U.S.C. §§ 12112, 12203(b)

**(Against Defendant NCDOT and the Individual Defendants in Their Official Capacities)**

185. Plaintiff realleges and incorporates by reference every preceding paragraph of this Complaint as if fully set forth herein.

186. Ms. Powell is a qualified individual with a disability. With or without reasonable accommodation she can perform the essential functions of her position, as she did for six and one-half years.

187. NCDOT had notice of Ms. Powell's disability no later than January 26, 2026, and had express written notice of her diagnoses and her accommodation requests on June 22, 2026.

188. Ms. Powell requested reasonable accommodations: permission to telework at least three days per week; an adjustable sit/stand workstation; and relocation away from a high-traffic conference room. Each request is a reasonable accommodation, not unduly burdensome, and NCDOT maintains a telework program under which such arrangements are routinely granted.

189. NCDOT failed to engage in the interactive process in good faith and failed to provide any accommodation. It ignored the June 2025 cubicle request entirely; it conducted a workstation assessment on June 4, 2026, and provided no equipment and no date; and after authorizing interim telework in writing on June 30, 2026, it withdrew that authorization the next morning and refused to pay Ms. Powell for the hours she had worked in reliance on it.

190. NCDOT's revocation of Ms. Powell's telework eligibility as a consequence of the retaliatory June 16, 2025, Written Warning foreclosed the very accommodation her physician later prescribed.

191. Defendants further interfered with, coerced, and intimidated Ms. Powell in the exercise of her ADA rights in violation of 42 U.S.C. § 12203(b).

192. As a direct and proximate result, Ms. Powell has suffered the injuries alleged above, including the exacerbation of her medical conditions, and is entitled to all relief available under 42 U.S.C. § 12117 and 42 U.S.C. § 1981a, including prospective declaratory and injunctive relief against the individual Defendants in their official capacities.

**COUNT IX**
**Retaliation in Violation of the North Carolina Whistleblower Act**
**N.C. Gen. Stat. §§ 126-84, 126-85**
**(Against All Defendants)**

193. Plaintiff realleges and incorporates by reference every preceding paragraph of this Complaint as if fully set forth herein.

194. North Carolina law declares it the policy of the State that State employees "shall be encouraged to report verbally or in writing to their supervisor, department head, or other appropriate authority, evidence of activity by a State agency or State employee constituting" a violation of federal or state law, fraud, misappropriation of State resources, or gross mismanagement, gross waste of monies, or gross abuse of authority. N.C. Gen. Stat. § 126-84(a).

195. Section 126-85 forbids any head of a State department, agency, or institution, or other State employee exercising supervisory authority, from discharging,

threatening, or otherwise discriminating against a State employee regarding compensation, terms, conditions, location, or privileges of employment because the employee reports or is about to report such activity. N.C. Gen. Stat. § 126-85(a).

196. Ms. Powell is a State employee protected by Article 14 of Chapter 126.

197. Ms. Powell reported, verbally and in writing, evidence of activity by NCDOT and its employees that she reasonably believed constituted violations of 49 C.F.R. Part 26, fraud in the administration of a federally funded program, misappropriation of State and federal resources, and gross mismanagement and abuse of authority — specifically, the certification and repeated recertification of a politically connected firm as a disadvantaged business enterprise without the documentation federal regulations require, and on a personal net worth statement an OIG auditor later found exceeded the program cap.

198. She made those reports to her supervisor Benny Sloan, to Defendant Marriott and the certification team, to NCDOT's retained certification consultant, to the United States Department of Transportation, and, in her Rebuttal of June 23, 2025 and her Step 1 and Step 2 grievances, to NCDOT's Human Resources and Employee Relations offices and to the agency's Chief Operating Officer.

199. Ms. Powell made those reports in good faith and had reasonable cause to believe the reported activity was improper. Her belief was in fact confirmed by the OIG auditor's findings.

200. Defendants thereafter took retaliatory personnel actions against Ms. Powell, including the administrative investigation, investigatory leave, the Written Warning, the revocation of telework, , the loss of compensatory time, the denial of a classification review, and the removal of her professional duties.

201. Ms. Powell raised her Whistleblower Act claim in the State grievance process, and NCDOT's Final Agency Decision of January 29, 2026, expressly adjudicated and rejected it, exhausting the administrative remedy.

202. Ms. Powell is entitled to the relief provided by N.C. Gen. Stat. § 126-87, including an injunction, reinstatement to her former position and duties, back pay, lost wages and benefits, and reasonable attorneys' fees, and to treble damages under N.C. Gen. Stat. § 126-87 for Defendants' knowing violation.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Latega Powell respectfully requests that this Court:

A. Issue a declaratory judgment that Defendants' acts, policies, and practices violated Title VII, the ADEA, the ADA, the FMLA, the First and Fourteenth Amendments to the United States Constitution, and the North Carolina Whistleblower Act;

B. Enjoin Defendants from further retaliation and discrimination against Plaintiff;

C. Order Defendants to expunge the June 16, 2025, Written Warning and all related investigative findings from Plaintiff's personnel file, and to restore her telework eligibility, and her forfeited compensatory time,

D. Order Defendants to conduct the classification review she requested in February 2024;

E. Order Defendants to provide the reasonable accommodations Plaintiff has requested and to engage in the interactive process in good faith;

F. Award Plaintiff back pay, front pay, lost benefits, and prejudgment and post judgment interest;

G. Award Plaintiff compensatory damages for emotional distress, humiliation, loss of enjoyment of life, and physical harm, in an amount to be determined by the jury;

H. Award Plaintiff liquidated damages under 29 U.S.C. §§ 626(b) and 2617(a)(1)(A)(iii);

I. Award Plaintiff punitive damages against the individual Defendants in their individual capacities under 42 U.S.C. § 1983;

J. Award Plaintiff treble damages under N.C. Gen. Stat. § 126-87;

K. Award Plaintiff her reasonable attorneys' fees, expert fees, and costs under 42 U.S.C. §§ 2000e-5(k) and 1988, 29 U.S.C. §§ 626(b) and 2617(a)(3), 42 U.S.C. § 12205, and N.C. Gen. Stat. § 126-87; and

L. Grant such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted, this 12th day of September 2026.

/s/ Valerie L. Bateman
VALERIE L. BATEMAN
NC State Bar No. 13417
NEW SOUTH LAW FIRM
209 Lloyd Street, Ste 350
Carrboro, North Carolina 27510
valerie@newsouthlawfirm.com
Tel: 919-810-3139

*Counsel for Plaintiff Latega Powell*